IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs June 28, 2022

**LAVONTE D. SIMMONS v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Knox County**
**No. 114182   Steven Wayne Sword, Judge**

**_____**

**No. E2021-00819-CCA-R3-PC**

**_____**

The Petitioner, Lavonte D. Simmons, appeals the denial of his petition for post-conviction relief, arguing that the post-conviction court erred in finding that he received effective assistance of trial counsel. Based on our review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3; Appeal as of Right; Judgment of the trial court affirmed**

JOHN W. CAMPBELL, SR., J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN and JILL BARTEE AYERS, JJ., joined.

Gerald L. Gulley, Jr., Knoxville, Tennessee, for the appellant, Lavonte Dominique Simmons.

Herbert H. Slatery III, Attorney General and Reporter; Kayleigh Butterfield, Assistant Attorney General; Charme P. Allen, District Attorney General; and Leslie Nassios, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

In May 2015, the Petitioner was convicted by a Knox County Criminal Court jury of first degree premeditated murder and two counts of aggravated assault. His convictions were affirmed by this court on direct appeal, and our supreme court denied his application

- 1 -

for permission to appeal. *State v. Lavonte Dominique Simmon*[1], No. E2016-01582-CCA-R3-CD, 2018 WL 1381786, at *1 (Tenn. Crim. App. Mar. 19, 2018), *perm. app. denied* (Tenn. July 19, 2018).

The Petitioner's convictions arose out of his role as the shooter in a June 7, 2013 drive-by shooting at the Knoxville home of Charles Maples and Uniqua Brown, which the Petitioner carried out in retaliation for his younger brother's having been robbed the previous night. *Id.* at *1-4. At the time of the shooting, siblings Jasmine and Akeem Hollingsworth were standing in the driveway of the Brown-Maples residence on Nolan Avenue talking to Ms. Brown, who was in the passenger seat of Mr. Maples' Chevrolet Caprice. *Id.* at *1. As the Petitioner's Co-Defendant, Shawn O'Neill, drove the Petitioner's green Toyota Camry past the home, the Petitioner, who was in the front passenger seat, made eye contact with Mr. Hollingsworth, whom the Petitioner believed to have played a role in the robbery. *Id.* "The Camry then stopped at 'the neighbor's driveway,' and the [Petitioner] 'pulled out' an AK-47 and 'opened fire' on the group." *Id.*

The Hollingsworth siblings both dropped to the ground when the shooting started. *Id.* Ms. Hollingsworth was uninjured and Mr. Hollingsworth suffered only a minor injury, but Ms. Brown died as a result of a severe gunshot wound to her side. *Id.* Following a "be-on-the-lookout" or "BOLO" issued for the Petitioner's Camry, police officers located and arrested the Petitioner and his co-defendant, who were hiding in the basement of the Moses Avenue home of Ms. Teresa Williams and her three children: Braxton, Bronson, and Blair Williams. *Id.* at *2. The Petitioner and Co-Defendant O'Neill were subsequently indicted together for the first degree premediated murder of Ms. Brown and the aggravated assaults of Mr. and Ms. Hollingsworth. *Id.* at *1. Their cases were later severed, and Co-Defendant O'Neill testified against the Petitioner at the Petitioner's trial. *Id.* at *3.-5.

According to Co-Defendant O'Neill's testimony, the Petitioner, the Petitioner's younger brother, Daquawn Simmons, and Co-Defendant O'Neill had all lived together in the same household in Memphis as children. *Id.* at *3. At the time of the shooting, Co-Defendant O'Neill and Daquawn[2] still lived in Memphis, but the Petitioner lived in Knoxville. *Id.* During the late evening/early morning hours of June 5-6, 2013, Co-Defendant O'Neill drove Daquawn to the Williams' family residence on Moses Avenue. *Id.* The Petitioner came to visit, and Co-Defendant O'Neill accompanied him when he left and spent the night with the Petitioner at the Petitioner's home. *Id.* The next morning, the Petitioner awakened Co-Defendant O'Neill to tell him that Daquawn had been robbed. *Id.*

---

[1] Consistent with the policy of this court, in our direct appeal opinion we used the spelling of the Petitioner's last name as it appeared in the indictment. *See Simmon*, 2018 WL 138176, at *1, n. 1. "Simmons" is apparently the correct spelling of the Petitioner's last name.

[2] For simplicity's sake, we will refer to Daquawn by his first name, as we did in our direct appeal opinion. We intend no disrespect by doing so.

The Petitioner then drove Co-Defendant O'Neill to the Moses Avenue residence, where a group of people, including Daquawn and Ms. Hollingsworth, were talking about the robbery. *Id.*

Co-Defendant O'Neill testified that Daquawn told them that he had had been forced to walk back naked to the Moses Avenue residence after the robbery and that he thought Tony Dixson had something to do with the robbery. *Id.* at *4. The Petitioner and Mr. Braxton Williams then went inside the Moses Avenue residence and the Petitioner emerged carrying an AK-47. *Id.* Ms. Hollingsworth, visibly frightened, left. *Id.* A short time later, Ms. Blair Williams called Ms. Hollingsworth, and the Petitioner got up and, armed with the AK-47, left alone in his Toyota Camry. *Id.* About five minutes later, the Petitioner returned, telling them that he had not seen anybody. *Id.*

Later, Ms. Blair Williams was again talking with Ms. Hollingsworth over the phone and put the conversation on speaker phone. *Id.* The Petitioner recognized voices in the background and he and Co-Defendant O'Neill reacted by immediately driving to the Brown-Maples residence, where the Petitioner opened fire with his AK-47. *Id.* Our direct appeal opinion summarizes this portion of Co-Defendant O'Neill's trial testimony as follows:

> After that, [Ms. Williams] was on the phone with [Ms. Hollingsworth] again, and she put [Ms. Hollingsworth] on speaker phone. According to Mr. O'Neill, "all of the sudden . . . there was [sic] voices heard over the speaker phone[,] and somebody busted out and said, they're over there, they're over there, because they're telling [Ms. Hollingsworth] to hang up the phone, hang up the phone." Mr. O'Neill testified that, in response, he and the [Petitioner] got in the Camry. Mr. O'Neill was driving. Mr. O'Neill said that Daquawn tried to talk them out of going to find Mr. Dixson, saying, "[D]on't worry about it, I've already filled out a police report." They went anyway.
>
> The [Petitioner], who had brought the AK-47 with him, gave directions to Mr. O'Neill as he drove because Mr. O'Neill did not "know where to go" being unfamiliar with the area. After turning onto Nolan Avenue, they spotted [Ms. Hollingsworth]'s car. The [Petitioner] instructed Mr. O'Neill "to go slow[,]" and he "pulled the gun out the window." Mr. O'Neill said that he then saw "movement out of [his] peripheral, but [he] never looked directly at the house." The [Petitioner] "opened fire" just as they passed the Brown-Maples residence, according to Mr. O'Neill. Mr. O'Neill did not see anyone else shooting and did not hear any other shots being fired. The [Petitioner] then said "go, go[.]" Mr. O'Neill "hit the gas," and the [Petitioner] directed him back to 1605 Moses.

- 3 -

*Id.*

On cross-examination, Co-Defendant O'Neill testified that Daquawn mentioned Mr. Hollingsworth's name as another individual possibly involved in the robbery. *Id.* at *5. Co-Defendant O'Neill saw "'some movement in [the] area'" of a GMC Envoy that was parked in the yard of the residence, but he did not think anyone other than the Petitioner fired because "all he 'heard was rapid fire' from the [Petitioner's] weapon." *Id.* He acknowledged, however, that he previously told the prosecutor that he believed someone else fired a shot at some point. *Id.* On redirect examination, he said he also told the prosecutor that it was possible that what he thought he heard was an initial shot fired by the Petitioner "'before he sprayed.'" *Id.*

Mr. Maples, who had given statements to the police and to the Petitioner's trial counsel, refused to testify at trial, invoking his Fifth Amendment right against self-incrimination. *Id.* at *6. As a result, an agreed-upon stipulation as to what Mr. Maples' trial testimony would have been was read to the jury and entered as an exhibit. *Id.* Mr. Maples' recorded police interview was also admitted as an exhibit and played for the jury. According to the stipulation, Mr. Maples would have testified that Mr. Dixson took his car sometime early on the morning of June 7, 2013. *Id.* When he returned the vehicle, Mr. Dixson told Mr. Maples that he and Shaquan Andrews had robbed Daquawn. *Id.* Mr. Maples did not know if Mr. Hollingsworth was involved in the robbery. *Id.* Later that day when Mr. Maples was shopping with Ms. Brown for strollers for their twins, Ms. Hollingsworth called Mr. Maples to warn him that "'the Moses men were looking to shoot them.'" *Id.*

When Mr. Maples and Ms. Brown returned home, Mr. Maples saw parked vehicles at his house that belonged to Mr. Dixson, Mr. Andrews' girlfriend, and Ms. Hollingsworth. *Id.* As he was getting one of his twins out of the car, the Petitioner slowly drove past his home, asking "What's up?" and then continuing down the street. *Id.* Mr. Maples found Mr. and Ms. Hollingsworth, Mr. Andrews, Mr. Dixson, and "Little Ty" inside his home, and "told them they had to leave." *Id.* At that time, Mr. Dixson was armed with a .45 caliber handgun and Mr. Andrews with a 9mm. *Id.*

Mr. Maples went outside again approximately five to seven minutes later after Mr. and Ms. Hollingsworth, Mr. Dixson, and "Little Ty" had already exited the residence. *Id.* Mr. Maples was on the screened-in porch with Mr. Andrews when the shooting occurred. *Id.* According to Mr. Maples, Mr. Dixson had moved into the yard before the shooting began. *Id.* Mr. Maples did not, however, see where he went. *Id.* Mr. Maples also did not see either Mr. Dixson or Mr. Andrews holding a gun when they exited the house and was unsure if anyone other than the passenger of the Camry fired a weapon. *Id.* He identified Daquawn as the shooter but was not certain of his identification. *Id.*

- 4 -

Other State's witnesses included a neighbor who lived behind the Brown-Maples residence, who reported hearing twenty-eight to thirty shots from the AK-47 and, in the midst of those shots, "three or four more shots" that sounded as if they came from a different gun "like an M-80 or something[.]" *Id.* at *8. The police investigation uncovered multiple bullet strikes to the Brown-Maples residence, to the next-door residence, to Mr. Maples' vehicle, to a Chevrolet Trailblazer parked in the driveway of the next-door residence, and to a maroon Buick Park Avenue parked in front of Mr. Maples' vehicle. *Id.* at * 2-3. "The damage to these vehicles and residences all came from an easterly direction." *Id.* at *3. Investigators found thirty-two spent 7.62 x 39mm shell casings in the road to the east of the residence, a bullet hole in the right side of a GMC Envoy that was parked diagonally across the Brown-Maples yard, four live 9mm rounds near the rear bumper of the Envoy, and four spent .45 shell casings "'to the right and around [a] little doghouse area[.]'" *Id.*

Investigator Jason Booker of the Knoxville Police Department testified that he learned during his investigation that Mr. Andrews' aunt lived next-door to the Brown-Maples residence. *Id.* at *9. "[D]uring a 9-1-1 call following the shooting, a female said that she 'saw someone carrying a gun from the scene of the shooting[,]'" and Mr. Maples later admitted that he had hidden an SKS rifle at Mr. Andrews' aunt's house before the police arrived at the scene. *Id.* Another neighbor told Investigator Booker that "'[Mr. Maples] ran with a bad group of folks, and he said there's actually been shootings over there at the house before.'" *Id.*

The Petitioner, whose statement to police in which he denied any involvement in the shooting was played for the jury during the State's case-in-chief, *id.* at *5, testified in his own defense at trial. *Id.* at *10-11. The Petitioner admitted that he was angry about his brother's having been robbed and that he retrieved the AK-47 and drove alone to the Brown-Maples residence to search for the robbers. *Id.* at *10. He claimed that his intention was only to get his brother's money returned. *Id.* He admitted that he and Co-Defendant O'Neill returned to the residence after he heard voices in the background of Ms. Hollingsworth's phone conversation with Ms. Blair. *Id.* He said that when they reached the residence, an African American man wearing a white shirt came out of nowhere and pointed a gun at him. *Id.* The Petitioner stated that he grabbed his AK-47 from the floorboard of his vehicle and yelled to Co-Defendant O'Neill to drive away, but Co-Defendant O'Neill accidentally put the vehicle in neutral for a moment before getting it in gear. *Id.* The Petitioner said that he started shooting at the gunman in the white shirt as Co-Defendant O'Neill was driving away. He was not certain that the gunman fired at him, but he believed that he did. *Id.* On cross-examination, the Petitioner "conceded that the bullet th[at] killed Ms. Brown 'must' have come from his gun." *Id.* at *11.

Among the issues the Petitioner argued on appeal was "that the [Petitioner] was deprived of his right to present a viable defense when the trial court permitted Charles Maples to assert the privilege against self-incrimination and, thereafter, refused to allow defense counsel to withdraw so that defense counsel could testify about Mr. Maples' past statements[.]" *Id.* at *1. In our direct appeal opinion, we found that "the [Petitioner's] issues surrounding Mr. Maples' trial testimony [were] waived for a plethora of reasons[,]" including the Petitioner's failure to include a transcript of the multiple hearings at which the parties apparently discussed the issue, defense counsel's failure to challenge Mr. Maples' invocation of his Fifth Amendment privilege, and the fact that an agreed stipulation as to Mr. Maples' testimony was entered into evidence without objection by the Petitioner until the motion for new trial. *Id.* at *16-17. After noting Mr. Maples' conflicting accounts of the shooting, we concluded that the Petitioner "was able to present his defense to the jury through Mr. Maples' statements [contained in the stipulation] without the possible detriment of questioning him at trial[.]" and that none of the Petitioner's issues surrounding Mr. Maples' testimony rose to the level of plain error. *Id.* at *18.

The Petitioner filed a pro se petition for post-conviction relief on November 2, 2018, followed by two pro se amended petitions filed after the appointment of post-conviction counsel. In his original and amended petitions, the Petitioner raised a number of claims, including ineffective assistance of trial counsel. On appeal, the Petitioner confines himself to arguing that his trial counsel provided ineffective assistance (1) for not raising as an issue in the motion for new trial the trial court's denial of trial counsel's motion to withdraw so that trial counsel could testify about Mr. Maples' exculpatory statements, (2), for not introducing exculpatory photographs to undermine the State's ballistics evidence, and (3), that he is entitled to post-conviction relief based on the cumulative effect of the multiple errors of trial counsel.

At the June 23, 2001 evidentiary hearing, the Petitioner first complained about trial counsel's failure to cross-examine Mr. Maples about his refusal to testify. The Petitioner stated that Mr. Maples was prepared to testify on the Petitioner's behalf until February 26, 2014, when Mr. Maples and Mr. Dixson were transported to the same jail and housed in neighboring cells, which gave Mr. Dixson the opportunity to threaten Mr. Maples. The Petitioner testified that, had his trial counsel cross-examined Mr. Maples at the hearing in which Mr. Maples invoked his Fifth Amendment right not to incriminate himself, counsel could have elicited information from Mr. Maples about the threat.

The Petitioner acknowledged that trial counsel filed a motion to withdraw in the hope that they would be allowed to testify about Mr. Dixson's threats, but the trial court denied their motion. He agreed that after the motion to withdraw was denied, trial counsel entered into a stipulation with the State as to Mr. Maples' testimony. The Petitioner

expressed his belief that his right to confront witnesses was violated by the stipulated testimony and that trial counsel "should have objected and conducted a hearing[.]"  The Petitioner testified that relevant and essential evidence left out of the stipulation was that Mr. Maples identified someone other than the Petitioner as the individual who shot Ms. Brown.  In addition, the stipulation hurt his case because it included information that the Petitioner was "there shooting and being in other criminal activities and things of that nature."

The Petitioner also complained about trial counsel's failure to combat the ballistics evidence introduced by the State.  Specifically, he believed that trial counsel should have presented a ballistics expert and introduced photographs that would have shown that the bullet that killed Ms. Brown did not come from an AK-47.  The Petitioner identified two photographs of bullets that, according to the Petitioner, showed the difference between the bullets fired by an AK-47 and the bullet that killed Ms. Brown.  He said the bullets depicted in the photographs appeared consistent with bullets fired by an AK-47 because they had a coating, or jacket, on them, whereas, according to the Petitioner's interpretation of the medical examiner's testimony, the bullet recovered from Ms. Brown's body did not.  The Petitioner testified that he discussed with his trial counsel the potential exculpatory nature of the photographs but counsel never introduced them or talked about the issue at trial.

On cross-examination, the Petitioner acknowledged that he told the trial court that he was okay with the stipulation.  However, "[t]he stipulation [he] agreed to was not the stipulation that was actually presented at trial."  He said he attempted to tell trial counsel that the stipulation was different from what he agreed, but they told him to wait until the end of trial and that they would raise it in the motion for new trial.  The Petitioner conceded that he was not a firearms or ballistics expert but said he had some familiarity with AK-47 bullets, had conducted online research, and had discovered "that a 7.62 by 39mm is a full metal jacket, FMJ, full metal jacket.  It has a coating on it and it has a jacket on it."  The Petitioner expressed his certainty that the bullet that killed Ms. Brown was not from an AK-47 based on his online research about AK-47 bullets having a full metal jacket and the medical examiner's testimony that the bullet fragments recovered from the victim's body did not have any particular coating that was discernible under a microscope.

The Petitioner acknowledged that his senior trial counsel was a very experienced attorney and that he had filed and argued numerous motions on his behalf, met with him a number of times, hired an investigator, and assembled an entire team to work on his case.  He believed, nevertheless, that trial counsel made a mistake in not presenting what the Petitioner was convinced was exculpatory ballistics evidence.

On redirect examination, the Petitioner explained his belief that photographs of the bullet holes in Mr. Maples' vehicle were exculpatory because they showed that the trajectory of the bullet that killed Ms. Brown was from somewhere other than the street:

> It says in the autopsy report that she was hit from left to right, upwards. Like, it travelled going up. So, basically, she would have had to have been shot with somebody moving, going like - - trying to duck and dodge and shoot up.

Senior trial counsel testified that he had been practicing law for over forty-one years, having been the Public Defender for the South Judicial District in Knoxville for approximately twenty-nine and one-half years, a private criminal defense lawyer for eight years, and a prosecutor for approximately two and one-half years. During that time, he had tried approximately eighty cases, most of which were murder cases, and had handled hundreds of other cases.

Senior trial counsel testified that his office was appointed to represent the Petitioner. He said in a case of the Petitioner's magnitude, an entire defense team was assigned that would consist of two to four lawyers, a full-time investigator, a social worker, and a secretary. If the case continued long enough, law clerks and summer externs would be assigned as well. In the Petitioner's case, the attorney who handled the appellate work in their office became involved early on as a sort of "de facto" member of the defense team, assisting senior trial counsel and co-counsel with pretrial motions and strategy decisions.

Senior trial counsel testified that their goal was to meet with the Petitioner at least once a week, and he estimated that either he or co-counsel, or both of them together, met with the Petitioner over a hundred times. Among other things, they kept the Petitioner informed about what was happening in his case, retained the services of an expert to explore the Petitioner's mental status and possible diminished mental capacity, investigated the background of the State's witnesses, and retained their own ballistics expert to review the crime scene evidence. Senior trial counsel testified that their ballistics expert ultimately reached the same conclusion as the State's expert - - that the fatal shot came from the AK-47 fired from the street. Senior trial counsel said that he and his co-counsel attempted as best they could to develop the proof at trial that there were other armed individuals at the scene. However, it would have been very difficult for them to argue that the fatal shot came from somewhere other than the AK-47 given their expert's conclusions and senior trial counsel's own examination of the vehicle at the impound lot, which convinced counsel "that the trajectory and the path came from back - - from the back and struck [Ms. Brown]." Senior trial counsel stated that the Petitioner was aware that they had retained a ballistics expert and was informed of the expert's conclusions.

Senior trial counsel testified that everyone at the residence at the time of the shooting had pending criminal charges and was represented by counsel, which made the process of interviewing witnesses more difficult. He said Mr. Andrews' attorney denied permission for counsel to talk to Mr. Andrews but they ultimately received permission from the other individuals' respective counsel. He and co-counsel were unable to locate Mr. Hollingsworth, despite repeated attempts, but they spoke in the penitentiary with Mr. Maples, who was cooperative and gave them a very favorable statement, and with Mr. Dixson, who was hostile and threatening and "made it very clear that Mr. Maples was in very grave danger if he . . . talked to [counsel] or cooperated or testified[.]" Senior trial counsel recalled that Mr. Dixson went so far as to threaten co-counsel if co-counsel did not relay Mr. Dixson's threat to Mr. Maples.

Senior trial counsel testified that when they interviewed Mr. Maples at the penitentiary, Mr. Maples told them that Mr. Dixson, Mr. Hollingsworth, and Mr. Andrews all exited the house before Mr. Maples, that all three of the men were armed with, variously, a .45, an SKS, and a 9mm, that Mr. Dixson was in the same position where spent .45 shell casings were found, and that Mr. Maples believed Mr. Dixson was the one who killed Ms. Brown. Mr. Maples additionally told them that the above three men were the ones who fired first.

Senior trial counsel testified that Mr. Maples, although initially willing to testify for the Petitioner, expressed grave concerns about his personal safety, informing counsel that Mr. Dixson had numerous fellow gang members in prison who would be able to get to Mr. Maples. Senior trial counsel said he assured Mr. Maples that counsel would go out of their way to protect him and would seek an order from the trial court that Mr. Dixson and Mr. Maples be transported separately and housed in different areas of the detention center. Although trial counsel obtained the order, when it came time for trial, Mr. Maples and Mr. Dixson were not only transported together on the same van, but also forced to sit beside each other for a considerable length of time due to weather delays. To make matters worse, they were then placed in side-by-side cells at the detention center. After that, Mr. Maples adamantly refused to testify.

Senior trial counsel testified that Mr. Maples refused to even go to the courtroom and that, short of dragging him, there was nothing they could do. Therefore, in a "Hail Mary" move, he and co-counsel filed a motion to withdraw in the hopes that they would be allowed to testify about Mr. Dixson's threats and Mr. Maples' statements to trial counsel. When the trial court denied the motion, they came up with the agreed stipulation that consisted of a combination of Mr. Maples' statements to trial counsel and to the police.

On cross-examination, senior trial counsel testified that they did not learn of Mr. Maples' refusal to testify until they visited him in the detention center on the weekend

- 9 -

before the Monday start of trial. He recalled that he and co-counsel visited Mr. Maples a second time in an attempt to get him to change his mind about testifying, to no avail. Therefore, after consulting with the appellate expert in their office, they came up with the idea of withdrawing from representation in order to become witnesses at the trial. Senior trial counsel testified that their office's appellate expert served as counsel on their motion to withdraw. He said the trial court denied the motion on the basis that the testimony they sought to present constituted inadmissible hearsay.

Senior trial counsel testified that he did not prepare the motion for new trial and that his guess was that it was prepared by their office's appellate expert. He said a different lawyer eventually took over the Petitioner's appeal, and he assumed that appellate counsel and his office's appellate expert consulted with each other about which issues to include in the motion for new trial or in an amended motion for new trial. Senior trial counsel believed that the trial court's denial of the motion to withdraw was included in the motion for new trial but said that he was not certain and that the motion would speak for itself.

On June 24, 2021, the post-conviction court entered a written order denying the petition on the basis that the Petitioner failed to meet his burden of demonstrating he was entitled to post-conviction relief. Thereafter, the Petitioner filed a timely notice of appeal to this court.

## ANALYSIS

Post-conviction relief "shall be granted when the conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn. Code Ann. § 40-30-103. The petitioner bears the burden of proving factual allegations by clear and convincing evidence. Id. § 40-30-110(f). When an evidentiary hearing is held in the post-conviction setting, the findings of fact made by the court are conclusive on appeal unless the evidence preponderates against them. *See Wiley v. State*, 183 S.W.3d 317, 325 (Tenn. 2006). When reviewing factual issues, the appellate court will not reweigh the evidence and will instead defer to the post-conviction court's findings as to the credibility of witnesses or the weight of their testimony. *Id.* However, review of a post-conviction court's application of the law to the facts of the case is de novo, with no presumption of correctness. *See Ruff v. State*, 978 S.W.2d 95, 96 (Tenn. 1998). The issue of ineffective assistance of counsel, which presents mixed questions of fact and law, is reviewed de novo, with a presumption of correctness given only to the post-conviction court's findings of fact. *See Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001); *Burns v. State*, 6 S.W.3d 453, 461 (Tenn. 1999).

To establish a claim of ineffective assistance of counsel, the petitioner has the burden to show both that trial counsel's performance was deficient and that counsel's

deficient performance prejudiced the outcome of the proceeding. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see State v. Taylor*, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that the same standard for determining ineffective assistance of counsel that is applied in federal cases also applies in Tennessee). The *Strickland* standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687.

The deficient performance prong of the test is satisfied by showing that "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996) (citing *Strickland*, 466 U.S. at 688; *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)). The reviewing court must indulge a strong presumption that the conduct of counsel falls within the range of reasonable professional assistance, *see Strickland*, 466 U.S. at 690, and may not second-guess the tactical and strategic choices made by trial counsel unless those choices were uninformed because of inadequate preparation. *See Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982).

The prejudice prong of the test is satisfied by showing a reasonable probability, *i.e.*, a "probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

Courts need not approach the *Strickland* test in a specific order or even "address both components of the inquiry if the defendant makes an insufficient showing on one." 466 U.S. at 697; *see also Goad*, 938 S.W.2d at 370 (stating that "failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim.").

The Petitioner contends on appeal that the post-conviction court erred in finding that he failed to meet his burden of demonstrating ineffective assistance of counsel. The Petitioner asserts that he provided clear and convincing proof that trial counsel was ineffective for, first, not raising the trial court's denial of trial counsel's motion to withdraw

as an issue in the motion for new trial, and second, for not introducing "exculpatory photographs relating to bullet holes and bullets from the scene of the shooting." The Petitioner argues that even if trial counsel's deficiencies in performance cited above did not individually result in prejudice to the case, "the cumulative effect of these errors met the requisite standard of clear and convincing proof so as to merit a new trial." The State points out that the trial court's denial of counsel's motion to withdraw was, in fact, included in the motion for new trial and argues that the post-conviction court properly denied the petition on the basis that the Petitioner failed to meet his burden of demonstrating ineffective assistance of counsel. We agree with the State.

In its order denying the petition, the post-conviction court found, among other things, that senior trial counsel was one of the most experienced criminal defense attorneys in the State, that senior trial counsel utilized an entire defense team that worked full-time on the Petitioner's case, and that senior trial counsel and his team fully investigated the case and possible defenses. The court found that "the unfortunate events which led to Mr. Maples' refusal to testify were completely beyond the control of trial counsel" and noted that the Petitioner appeared "to have a misunderstanding" about an attorney's ability to force testimony from someone who has asserted a Fifth Amendment right against self-incrimination. The court further found that the Petitioner failed to show that there was any ballistics evidence that trial counsel failed to present that would have contradicted the findings of the State's ballistics expert. Accordingly, the post-conviction court concluded that the Petitioner failed to meet his burden of proving that he was denied the effective assistance of counsel.

The record fully supports the findings and conclusions of the post-conviction court. As the State points out, the record from the direct appeal reveals that the denial of trial counsel's motion to withdraw was specifically raised as an issue in the motion for new trial, along with several other related issues surrounding Mr. Maples' trial testimony. Senior trial counsel's testimony, which was implicitly accredited by the post-conviction court, established that senior trial counsel and his defense team thoroughly investigated the case, met regularly with the Petitioner to keep him informed, explored available defense strategies and options, and made every effort to introduce evidence of Mr. Maples' statements to counsel about the shooting, as well as Mr. Dixson's threats to Mr. Maples. Senior trial counsel's testimony also established that he retained his own ballistics expert, who reached the same conclusion as the State's expert. The Petitioner has not met his burden of proving that his trial counsel were deficient in their performance or that he was prejudiced by any alleged deficiency on the part of trial counsel.

Finally, because he has not shown that counsel was deficient in their performance, the Petitioner's argument that he is entitled to post-conviction relief based on the cumulative effect of counsel's errors is without merit. Because we have concluded that the

trial counsel did not commit any errors, the Petitioner is not entitled to relief under the cumulative error doctrine.

Accordingly, we affirm the judgment of the post-conviction court.

## CONCLUSION

Based on our review, we affirm the judgment of the post-conviction court.

_____
JOHN W. CAMPBELL, SR., JUDGE